**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EXHIBIT WORKS, INC., a <br> Michigan corporation, <br>            Plaintiff, <br><br> v. <br><br> INSPIRED EXHIBITS, INC., an <br> Illinois corporation, STEPHEN KELKE, <br> ROBIN WHITE, LINDSAY MILLSAP and <br> ROBERT HERDMAN, <br>            Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No. 05 C 5090 <br> ) <br> ) |
| STEPHEN KELKE, ROBIN WHITE, <br> LINDSAY MILLSAP and ROBERT <br> HERDMAN, <br>            Counterplaintiffs, <br><br> v. <br><br> EXHIBIT WORKS, INC., a <br> Michigan corporation, <br>            Counterdefendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    Honorable James F. Holderman <br> )    U.S. District Court Judge <br> ) <br> )    Honorable Martin C. Ashman <br> )    U.S. Magistrate Judge <br> ) |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Defendants, INSPIRED EXHIBITS, INC. ("IEI"), STEPHEN KELKE ("Kelke"), ROBIN WHITE ("White"), LINDSAY MILLSAP ("Millsap") and ROBERT HERDMAN ("Herdman") (collectively, "Defendants"), by their attorney, Alexander D. Kerr, Jr. of TISHLER & WALD, LTD., hereby respectfully request that the Court deny the preliminary injunction sought by Exhibit Works, Inc. ("EWI") for the reasons stated hereinafter. In support of their response, Defendants incorporate their Verified Answer (verified by the declarations of Defendants attached hereto), the affidavits of each individual Defendant,[1] and state as follows:

---

[1] Affidavits of individual Defendants are attached hereto, incorporated herein by reference, and provide additional factual detail responsive to Plaintiff's declarations. Select deposition transcripts are included as well. Defendants' affidavits will be referenced as "_____ Aff." Depositions will be referenced as "_____ Dep."

## I. **Introduction**

Defendants Kelke, White, Herdman and Millsap ceased employment at EWI on Thursday, August 18, 2005. These Defendants neither possessed nor took documents with them that had been marked as confidential while they were employees. EWI has no non-compete agreement or non-solicitation agreement with any of the individual Defendants. *See, e.g.*, Kelke Aff. ¶¶ 4-6. Nevertheless, EWI avers that it is entitled to a Preliminary Injunction because it claims: (a) Defendants misappropriated unidentified trade secrets; (b) Defendants breached their fiduciary duty; (c) EWI does not have an adequate remedy at law; and (d) its incidental loss of revenue outweighs putting Defendants out of business.

## II. **Factual Background**

Historically, EWI has been principally known as an automotive exhibit house. Pursuant to a 2002 white paper, a satellite studio was created in Lisle, Illinois to test diversification into the general trade show market. The Lisle studio had limited warehouse space and no display set construction capacity. Construction needs were satisfied by local subvendors and/or utilization of EWI Michigan and/or EWI California construction shop capacity. Kelke Aff. ¶ 27.F at p. 11.

In 2005, EWI commenced a program of implementation of ISO and 6 SIGMA standards primarily at the insistence of major automotive customers. In mid-April 2005, EWI senior management informed, *inter alia*, Kelke that there would be a major reorganization and restructuring of the company. On May 1, 2005 and subsequently, EWI issued company-wide e-mail notices of the restructuring and reorganization. The restructuring reduced the independence, authority and responsibilities of the heads of the various satellite facilities. On May 12, 2005, Dominic Silvio, President of EWI, and Bill Ciccone, Vice-President of Human Resources, made a presentation to Lisle personnel of the reorganization. Later, in response to a question by Kelke that he didn't know how he would fit now into the corporation, Dominic Silvio responded that Kelke was to be the senior Illinois salesperson. Previously, Kelke had budgeting, estimating, purchasing, contracting and P&L responsibilities and authority. Subsequent to May 1, budgeting, estimating, purchasing, etc. were all being consolidated and centralized at EWI's Livonia, Michigan headquarters, leaving satellite facility heads with nominal P&L accountability, but vastly reduced authority to take actions and make decisions impacting the P&L results. Kelke Aff. ¶¶ 9-11.

In late April or early May 2005, Kelke attended a periodic meeting with Linda McGovern ("McGovern"), the then overall marketing head for International Truck and Engine Co. ("International") having responsibility for oversight of exhibits and trade shows. During that meeting, Kelke again described EWI capabilities and alluded to corporate restructurings. McGovern responded by commenting upon International's past experiences with larger vendors who centralized functions which, in her stated experience, reduced responsiveness and increased cost. She commented upon current status of PR and advertising vendors, one of which had been terminated. Kelke Aff. ¶ 27.E; McGovern Dep. p. ___. (Transcript will be provided when received.)

Kelke determined that if International pulled its business from EWI, he and those Lisle employees whose predominant time was spent on International matters would immediately become excess and would probably be terminated. As a result, Kelke met with White and Herdman, offsite and after hours, to discuss creation of a small trade show-oriented exhibit house in order to provide a means of sustaining themselves. The evolved plan was to create a new company shell, provide two weeks' notice, aid in the orderly turnover of accounts and information within EWI, leave EWI, and commence operations as a new company with the hope that trade show exhibitors would consider them qualified and provide business. It was recognized that the departed individuals would have relevant knowledge necessary for a customer to receive desired services for previously scheduled shows, regardless of whether EWI, the new company, or some entirely different independent vendor was going to provide the services. In all cases, coordination would have to exist between EWI, the departed individuals, and the customer(s).

Kelke informed McGovern of his intention to leave EWI and start his own exhibit company. As Labor Day approached, which had been selected by Herdman, Kelke and White as the target date for the commencement of new business operations, McGovern accepted a new position with a new employer. McGovern recognized that she was the only person within International who knew of the intention to start a new company after Labor Day, and recognized that there would be an inevitable need for persons involved in shows to be able to reach individuals who had been involved with them regardless of where they were and regardless of what go-forward decisions would be made by International, prepared an internal e-mail providing contact information and expressing her personal encouragement. At the time that

McGovern issued her e-mail, she was no longer employed by International and had no authority to make any decisions concerning present or future business placement of International business. Donlavey Dep. pps. 44, 73; McGovern Dep. p. ___.

When McGovern's e-mail was discovered by EWI prior to the tender of the notices of resignation, EWI immediately terminated all EWI personnel identified in the e-mail. While EWI rejected the Defendants' offers of transition coordination, Kelke, nevertheless, supported the recently acquired Bentley Motors account which he had obtained for EWI. EWI's terminations caused the Defendants to immediately activate the new company prior to the post-Labor Day target date.

With no transition, International had to make immediate decisions regarding imminent deadlines and events, including making decisions as to who was going to provide necessary services in the near term for scheduled shows. Amanda Donlavey ("Donlavey"), who had succeeded McGovern with regard to pending shows, and who had previously terminated EWI services in Canada, issued a termination notice to EWI, requested final billing, and sought the immediate turnover of all display items. Donlavey Dep. pp. 50-51.

When terminated, the individual Defendants had some copies of some current or historic material, none of which was confidential, and all of which would have been otherwise generally available from known vendors, customers and exhibit sites. All documents of EWI which had been circulated in envelopes or mailers marked confidential or dealt with go-forward budgets and financial records were left at EWI, and no copies of such materials were held by or taken by any of the individual Defendants. Kelke Aff. ¶¶ 28-29; White Aff. ¶¶ 13-17; Herdman Aff. ¶¶ 17-18; Millsap Aff. ¶¶ 10-11.

By November 4, 2005, all 2005 shows for which some EWI billable services had been performed will have been concluded. Both before and after November 4, 2005, Defendants will have performed post-termination services for International which had never been mentioned to EWI. To the extent that any non-confidential datum (_e.g._, e-mail copies of International communications to individuals) was taken by any Defendant, its business utility expired with the commencement of the subject show. Kelke Aff. ¶¶ 28-29; White Aff. ¶¶ 16-17.

### III. No Preliminary Injunction Should Issue

A.      Elements of a Preliminary Injunction:  Plaintiff must show: (1) that it has a reasonable chance of success on the merits on the underlying claims; (2) that it has no adequate remedy at

law; and (3) that it will suffer irreparable harm if the injunction is not granted. *Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 436 (N.D. Ill. 1994). Even "…[i]f these three conditions are met, then the Court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently. This balancing by the court involves a "sliding scale" analysis: the greater the movant's chance of success on the merits, the less strong a showing the movant must make that the balance of harms is in movant's favor. In addition the court must consider the public interest in deciding whether the injunction is to be granted or denied." *Id.*

## IV. <u>Plaintiff Has No reasonable Chance of Success on Merits</u>

B.    <u>Plaintiff's Trade Secrets Act Cause of Action is Meritless</u>: The Illinois Trade Secrets Act ("ITSA" or the "Act"), 765 ILCS 1065 *et seq.*, specifically defines "trade secret." 765 ILCS 1065/2(d).  Essentially, the Act requires EWI to show that the information it is seeking to protect is sufficiently secret to give it a competitive advantage.  Second, it must show that it took affirmative measures to prevent others from acquiring or using the information. 765 ILCS 1065/2(d)(2); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 921, (Ill. 1st Dist. 2005).  If such analysis shows that a trade secret exists under the Act, Plaintiff must then also show that the trade secret was "misappropriated." 765 ILCS 1065/2(b), defines "misappropriation."

1.    <u>EWI Motion Fails to Inform Defendants of What Trade Secrets It Seeks to Protect</u>: Plaintiff's motion should be denied from the outset because neither it nor the proposed order identify the trade secrets with any degree of specificity as to what it seeks to protect. *See* EWI's proposed Preliminary Injunction at 2 (prohibiting defendants from "using or disclosing plaintiff's confidential or trade secret information acquired by defendants in the course of or arising out of their employment..."). "Specifically, the order does not set forth what the trade secret business and technical information is that cannot be disseminated." *Roton Barrier, Inc. v. The Stanley Works*, 79 F.3d 1112, 1122 (1996), app. after remand 108 F.3d 1394 (Fed. Cir. 1997). Defendants thus lack sufficient notice under Fed. R. Civ. P. 65. *Id.* at 1122 (citations omitted); *see also Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."). Instead of "concrete secrets," EWI lists every bit of business information individual Defendants "had access" to. EWI's Motion at ¶29. EWI also alleges that Kelke attended a meeting that

discussed "financial performance, sales and marketing strategies, relationships with existing clients, key business prospects, in-process and proposed marketing projects, and corporate goals." EWI's Motion at ¶11. Plaintiff fails utterly to tie any of these broad categories of information to any "concrete" trade secret or confidential information. In fact, the meeting in Michigan had very little to do with the non-auto trade show business that IEI is intending to service. Kelke Aff. at ¶27 (D).

These allegations do not provide the level of specificity needed to support injunctive relief. *See Springfield Rare Coin Galleries v. Mileham*, 620 N.E.2d 479, 486 (Ill. 4th Dist. 1993) ("the determination of whether an employee received confidential information does not involve an inquiry into whether the employee learned *anything* during his employment, but whether the employee learned a trade secret, confidential process, or the like."). *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), relied on by EWI, makes the distinction well:

> It is not the "general skills and knowledge acquired during his tenure with" PepsiCo that PepsiCo seeks to keep from falling into Quaker's hands, but rather "the particularized plans or processes developed by [PCNA] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *Id.* at 1269 (citation omitted).

Here, unlike in *PepsiCo*, EWI has articulated no "particularized plan or process" it developed that it seeks to protect, nor has it shown any specific "technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers." 765 ILCS 1065/2(d).

2.    There are No Enforceable Restrictive Covenants: EWI is limited to the scope of the ITSA only. Unlike many of the cases EWI cites, here there are no valid, enforceable restrictive covenants. *See Strata Mktg., Inc. v. Murphy*, 740 N.E.2d 1166, 1169 (Ill. 1st Dist. 2000) (non-compete agreement a year beyond employment); *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 864 (N.D. Ill. 2001) (three year non-compete agreement). *See* Kelke Aff. at ¶¶ 5-6 (no non-compete or non-solicitation agreements); White Aff. at ¶¶ 5-6 (same); Millsap Aff. at ¶¶ 5-6 (no non-compete or non-solicitation agreements); Herdman Aff. at ¶¶ 4-7. Instead, EWI offers three documents that it argues, acting together, create a restrictive covenant: (1) the non-disclosure language in the personnel policy guidelines (non-binding, at-will employees); (2) the Conflict of

Interest Agreement signed by Defendants in late 2004; and (3) the late 2004 Confidentiality Agreement. None create any restrictive covenant.

(i)     <u>Restrictive Covenants are Disfavored</u>:  Restrictive covenants in employment are disfavored. *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002). "Because such covenants operate at least as partial restraints on trade, courts scrutinize them carefully to ensure that their intended effect is not the prevention of competition *per se*." *Pactiv Corp. v. Menasha Corp.*, 261 F.Supp.2d 1009, 1013 (N.D. Ill. 2003).

(ii)     <u>The Personnel Policies are Not a Restrictive Covenant</u>:  The personnel policies guidelines are not an employment agreement or binding restrictive covenant, but merely a generic statement of policy. The "non-disclosure" provision of the personnel guidelines explicitly states that "All employees are required to sign a non-disclosure agreement as a condition of employment." However, no such agreement was signed by Defendants as a condition of employment.

(iii)     <u>The Confidentiality Agreement is Overbroad and Cannot Support Injunctive Relief</u>. Because such covenants are restraints on trade, they will still not be enforced unless reasonable. *Pactiv, <u>supra</u>.*, at 1013. Here, the Confidentiality Agreement is so overbroad that it gives the Court no guidance as to what should be enjoined. "Confidential Information" is defined as: "*any information of any kind, nature or description* concerning *any* matters affecting or relating to Employee's services for Exhibit Works, Inc., the business or operations of Exhibit Works, Inc. and/or the products, drawings, plans, processes, or other data of Exhibit Works, Inc." By its wording, it would include anything having to do with EWI, including Defendants' own knowledge, work product and experience, whether it was actually confidential or widely known to or received from clients, competitors or the general public, none of which a trade secret. *ILG Indus., Inc. v. Scott*, 273 N.E.2d 393, 396 (Ill. 1971); *see also Appelbaum v. Appelbaum*, 823 N.E.2d 1074, 1082 (Ill. 1st Dist. 2005).

A court should not refashion an overly broad restrictive covenant in an attempt to create one that may be enforceable. *Eichmann v. National Hosp. & Health Care Services, Inc.*, 719 N.E.2d 1141, 1149 (Ill. 1st Dist. 1999), app. den. 724 N.E.2d 1267 (Ill. 2000). EWI is a multi-million dollar corporation which could have drafted a comprehensive, but enforceable, confidentiality agreement, but it did not. For the Court to modify it to make it narrow enough to be enforceable, would "have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements." *Id.*

(iv)   The Confidentiality Agreement and Conflict of Interest Statement Fail for Lack of Consideration:  To be valid restrictive covenants must be:  (1) ancillary to a valid contract; and (2) supported by adequate consideration.  In an at-will employment situation, restrictive covenants entered into after the relationship began, without an additional benefit to the employee or detriment to the employer, lack consideration where the relationship did not last long after the covenant was signed.  *Compare Mid-Town Petroleum, Inc. v. Gowen*, 611 N.E.2d 1221, 1227 (Ill. 1st Dist. 1993) (seven months continued employment after execution of restrictive covenant insufficient); *with Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 441 (Ill. 2nd Dist. 1997) (29 months sufficient); *Abel v. Fox*, 654 N.E.2d 591, 598 (Ill. 4th Dist. 1995) (three years sufficient); *Agrimerica, Inc. v. Mathes*, 557 N.E.2d 357, 362 (Ill. 1st Dist.), app. den. 564 N.E.2d 834 (Ill. 1990) (more than two years sufficient).

Here, Defendants were asked to sign the Confidentiality and Conflict of Interest Agreements months prior to being fired.  The length of continued employment is about the same as the seven months in *Mid-Town Petroleum* that was found to be insufficient to provide consideration and nowhere near the two-plus years of *Able, Lawrence & Allen*, or *Agrimerica*. These agreements thus fail for lack of consideration.

3.   EWI has Identified No Trade Secrets:  Since the Motion lacks specificity regarding what purported trade secrets are at issue, Defendants are forced to guess.  Defendants will address areas of concern they have gleaned from EWI's Motion and the underlying Complaint: customers and pricing data.

(i)   Customers are Not Protected Trade Secrets:  EWI's complaint revolves around International's decision to move its trade show business after Defendants had been terminated and activated IEI.  However, customers are not protected trade secrets.

> While clientele may properly be called the customers of a particular business, they cannot be considered the 'property' of that business.  While a business can have a proprietary interest in lists of customers which it maintains, no business has a proprietary interest in the customers themselves.  *Southern Ill. Med. Bus. Assocs. v. Camillo*, 546 N.E.2d 1059, 1067 (Ill. 5th Dist. 1989), sub. proceeding 567 N.E.2d 74 (1990).  (No such proprietary "client list" exists in this case.)

(ii)   EWI Had No Near-Permanent Relationship with International:  Defendants have also been unable to find a single case where a court has enjoined competition based on the "near-permanent relationship" test in the absence of a non-competition agreement.  Since it cannot

point to a covenant not to compete or a client list, EWI attempts to enjoin competition by claiming it has a "near-permanent relationship" with International.

Illinois Courts have generally found a protectable "near-permanent relationship" only for those businesses that are "professional or psuedo-professional." *Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1081 (Ill. 1st Dist. 1992), app. den. 610 N.E.2d 1266 (Ill. 1993). The nature of the business in this case is not the type where the "near-permanent relationship" test is successful. Sales-related businesses generally do not have "near permanent relationships" with clients. *Lawrence & Allen, Inc.*, *supra.*, at 444. "[A]s a general rule an advertising agency relationship with its customers is transitory and not permanent." *Office Mates 5, supra.*, at 1081. Far from being near-permanent, EWI's relationship with International was near likely termination. Kelke Aff. at ¶ 22. International was not especially loyal to EWI or any other vendor. It used multiple vendors for its exhibit work. Kelke Aff. at ¶ 27(A)(iii). Neither was EWI loyal to International. In pursuing its prime business, EWI understandably climbed aboard the ISO and 6 SIGMA compliance bandwagons. Mandating changes from the top down, it failed to heed the concerns of those in the non-automotive arena as to the impact on the reorganizational and procedural changes on their narrow segment of the business like International. International was rightly concerned about these changes, based on its experience with other service providers. Kelke Aff. at ¶ 27(E)(I). There simply was no "near-permanent" relationship. Indeed, EWI admits that it has no contract with International.

(iii)    <u>EWI's Pricing Data is Not Protected</u>: EWI also argues that its pricing data is a protective trade secret. Discovery has shown that it is generally understood within the industry, and conceded by the parties, that quotes can be fundamentally reverse-engineered from exhibitor information, published union wage scales, general sub-vendor price quotes related to carpentry, carpet, transportation, etc. This is especially true where a customer shares a competitor's bid. Thus, margins of the various competitors within the industry are generally known or knowable and, once issued by an exhibit house to a customer or potential customer, would cease to have any possible trade secret claim. The only time that such price quotes might be competitively sensitive is at the moment they are being calculated and immediately prior to their delivery to the potential customer. A customer can, and periodically does, share competitive price quotes among the competitors. Byrne Dep. pp. 4-7; Kelke Dep. II pp. _____ (transcript will be provided when received). There is no protectable trade secret in information which is easily

obtained, often publicly available. More fundamentally, past price quotes bear little relationship to future jobs. *See Applied Indus. Materials Corp. v. Brantjes, supra.*, at 438 (3-year old pricing data lacked "current economic value"). In *Brantjes*, even though the data changed little from year to year, it was still "historical at best" and "just too old to have continued economic value." *Id.* at 439.

Here, customers change their exhibits. Sometimes they use parts of prior exhibits, sometimes they mix and match exhibits from different exhibitions, sometimes they construct entirely new exhibits. Exhibition venues change. Rarely, if ever, is a future exhibition job a mirror image of a previous one. Thus, any information any of the individual Defendants had when they left EWI would have already become irrelevant with the passage of time.

(iv)     "Inevitable Disclosure" Doctrine is Inapplicable: EWI throws in a reference to the "inevitable disclosure" doctrine to support its ITSA claim. However, this is a bootstrap without boots. "To invoke this doctrine, the complaint must do more than make conclusory allegations that the employees will necessarily use trade secrets in their new positions." *AutoMed Techs., Inc. v. Eller*, 160 F.Supp.2d 915, 921 (N.D. Ill. 2001). As discussed above, EWI has failed to identify a single, protectable trade secret. Individual Defendants' Affidavits make clear that they have turned over all limited residual documents related to EWI, which happened to be in their possession at the time of their abrupt termination. Kelke Aff. at ¶ 15; White Aff. at ¶17; Millsap Aff. at ¶¶ 10-11; Herdman Aff. at ¶¶ 9, 18. The sole exception to this blanket statement is that the designer, who did not sign any confidentiality agreement, maintained a historic portfolio of design work he had done — a practice which he had engaged in with prior employers and which he intends to continue with his current employer.

4.     No Trade Secrets Were "Misappropriated": In addition to failing to prove the existence of a trade secret under the ITSA, EWI has also failed under the second prong of the Act, *i.e.*, that Defendants "misappropriated" a trade secret. For the reasons set forth below with respect to the breach of fiduciary duty and tortious interference claims, EWI has not shown any "improper means" were used; nor was there a "duty to maintain secrecy." 765 ILCS 1065/2(b). As discussed above, documents in Defendants' possession upon termination were promptly turned over to EWI.

5.     EWI Did Not Take Steps to Protect Purported Trade Secrets: Assuming, *arguendo*, there were protectable trade secrets, EWI must also show specific steps were taken to protect them.

*Liebert Corp. v. Mazur*, supra., at 923. Here, EWI took no steps to protect the virtually unlimited range of information it claims as a trade secret. As discussed above, there was no non-compete or non-solicitation agreement. Even the "Conflict of Interest" agreement (which fails for overbreadth and/or lack of consideration) contains no specific language that could be interpreted as a non-solicitation or non-competition agreement that extended beyond the scope of employment. Further, EWI failed to mark and handle information as confidential with the possible exception of Executive Committee agenda, notes and budget information – none of which is at issue in this case. Kelke Aff. at ¶ 16; White Aff. at ¶17; Millsap Aff. at ¶¶ 10-11; Herdman Aff. at ¶17. EWI's ITSA cause of action fails on this prong as well.

C.    <u>Defendants Did Not Breach Their Fiduciary Duty</u>: EWI argues that Defendants were officers. Defendants were not officers. Defendants were not titled officers, and did not hold themselves out as officers. *H & H Press, Inc. v. Axelrod,* 638 N.E.2d 333, 336-9 (Ill. 1st Dist. 1994). Defendants' actions, job descriptions, duties and responsibilities did not create an agency relationship tantamount to an officer or director. Defendants did not have the authority and autonomy of an officer. They did not have the "hallmarks of a fiduciary." *Foodcomm Int'l. v. Barry,* 328 F.3d 300, 304 (7th Cir. 2003). EWI's implementation of ISO and 6 SIGMA standards reduced the independence and authority of the Lisle satellite office. Budgeting, estimating purchasing were all centralized at corporate headquarters. Kelke's role with EWI was reduced to senior salesperson. While Defendants were not officers even before the restructuring, the restructuring further precluded any agency relationship between Defendants and EWI.

Defendants were employees of EWI. Employee(s) may plan, form and outfit a competing corporation while still working for an employer. *Veco Corp. v. Babcock,* 611 N.E.2d 1054, 1059 (Ill. 1st Dist.), app. den. 622 N.E.2d 1229 (Ill. 1993). Defendants took only preliminary and preparatory steps toward forming IEI prior to their termination from EWI. Articles of Incorporation were filed on June 6, 2005; a Federal Tax Identification number was obtained on June 10; the S-Corporation Election was made June 16. EWI terminated Defendants on August 18, 2005. Defendants did not obtain bank financing until August 29, 2005, and signed a lease after termination.

EWI argues that Defendants did more than just form a rival concern. EWI argues that Defendants commenced business while still employed by EWI and solicited customers of EWI. Although pre-termination solicitation of clients is not permissible, officers may advise clients of

their intent to leave and of their plans to form a competing business prior to termination. *Ellis & Marshall Assocs., Inc. v. Marshall*, 306 N.E.2d 712, 717 (Ill. 1st Dist. 1973). "In the absence of a contractual restrictive covenant, the improper taking of a customer list, or fraud, former employees may compete with their former employer and solicit former customers so long as there was <u>no demonstrable business activity</u> by the former employee before the termination of employment." *Veco, supra.*, at 1059. (Emphasis added.)

Subsequent to the internal restructuring of EWI, Kelke met with McGovern at International and informed her of the organizational change. McGovern asked if Kelke was going to quit. McGovern commented on her preference to work with local firms because of their responsiveness to International's needs. McGovern was the only International employee aware of Defendants' intent to start their own company. At no time prior to termination did Defendants have a commitment from International that its business would follow them, and Defendants decision to leave was not predicated on International or any other client of EWI following them. At no time did Defendants ever service International or any other customer as IEI while still employed by EWI.

Defendants' decision to leave was the natural consequence of EWI's restructuring which emphasized automotive core competency at the expense of trade shows. It was Defendants' intent to provide EWI two week's notice prior to terminating their employment and turn over their accounts to their EWI replacements to provide a smooth transition. In fact, Kelke went to great lengths to assist EWI in reacquiring the Bentley Motors account with estimated annual billings of $750,000-$1,000,000. Defendants did not leave in an "unseemly manner." *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 769 (Ill. 1st Dist.), app. den. 823 N.E.2d 964 (2004). They did not engage in pre-termination behavior which economically threatened EWI; *(id.* at 762; *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228,1233 (Ill. 1st Dist. 1978)); plan a mass employee exodus (*id.* at 1234; *Dowd, supra.*, at 764); steal databases and client information (*Everen Secs., Inc. v. A.G. Edwards & Sons, Inc.*, 719 N.E.2d 312, 315 (Ill. 3rd Dist. 1999)); or slander EWI. *ABC Trans, supra.*, at 1238.

D.    <u>EWI's Tortious Interference Claim Fails</u>: To establish a cause of action for tortious interference with a prospective economic advantage, Illinois law requires that Plaintiff prove: (1) the existence of a valid business relationship or expectancy; (2) Defendants' knowledge of the relationship or expectancy; (3) Defendants' purposeful wrongful interference that prevents the

legitimate expectancy from ripening into a valid business relationship or termination of that relationship; and (4) resulting damages. *Dowd*, *supra.*, at 767.

Defendants knew that EWI and International had a business relationship. However, Defendants did not purposefully interfere with that relationship. "[T]o prevail on the claim a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference,' meaning the defendant has committed some impropriety in doing so." *Id.* at 768. In *Dowd*, defendants covertly solicited the firm's largest account prior to terminating their employment. *Id.* at 769. Defendants' actions caused Dowd's largest client to cease doing business with the firm without having a free and unfettered choice regarding whether it should have kept its business with them. *Id.*

Here, Defendants did nothing more than inform McGovern that they were leaving EWI. This does not even come close to "purposeful interference."

E.    <u>EWI Has an Adequate Remedy at Law</u>: EWI has an adequate legal remedy in money damages. All trade shows Defendants were involved in on behalf of EWI either have already or will have taken place by November 4, 2005. White Aff. at ¶ 15. If EWI has been harmed, that harm is not ongoing, and any harm it may have suffered in the past could be quantified to determine money damages.

F.    <u>EWI Has Not Shown Irreparable Injury</u>: Irreparable injury to the Plaintiff is presumed only if a protectable interest is established and the interest remains unprotected. *A-Tech Computer Servs., Inc. v. Soo Hoo*, 627 N.E.2d 21, 27 (Ill. 1st Dist. 1993), app. den. 638 N.E.2d 1112 (Ill. 1994). Here, EWI had no protectable interest. EWI and International did not have a written contract. It is axiomatic that an at-will relationship continues only so long as both parties choose to do so. International has terminated its relationship with other advertising vendors who centralized administration. In fact, International had previously terminated its relationship with EWI in Canada. Donlavey Dep. pp. 50-51. International was free to make its own business decisions and did so. Without a protectable interest, there is no irreparable injury and an injunction should not issue.

G.    <u>Balancing Hardships Favors Defendants</u>: EWI's proposed injunction Order seeks to bar Defendants "... from soliciting, assuming or performing business from actual or potential customers of Exhibit Works to whom they made sales or from whom they solicited sales while employed by Exhibit Works." In short, EWI seeks through the back door to prevent customers

from exercising their right to determine whom they want to service particular trade shows occurring after the date of the entry of the Order. The literal language for the proposed Order would bar a customer from seeking Defendants' services for a show occurring after its entry and for which no activity had been undertaken prior to the entry of the injunction. This language demonstrates the true purpose of the litigation: to destroy Defendants' business from the start. EWI would deny third parties, such as International, the right to use their preferred vendor for their exhibit needs.

## IV. Conclusion/Prayer

Despite the smoke and mirrors in Plaintiff's motion, there is simply nothing appropriate for the Court to enjoin. EWI has failed to identify any "trade secret" as defined by the ITSA, *i.e.*, no "technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers." 765 ILCS 1065/2(d). There is no restrictive covenant to enforce and no "near-permanent" clients to enjoin the solicitation of. EWI has shown no proprietary records purloined, nor any proprietary pricing strategy that Defendants can unfairly make use of. In the end, all the Court is faced with is that IEI is a competitor of EWI, and the law will not enjoin competition *per se* – in fact, it encourages it.

This case presents classic illustrations of the doctrine of unintended consequences and Murphy's Law. In pursuing its prime automotive business, EWI understandably climbed aboard the ISO and 6 SIGMA compliance bandwagons. However, it failed to comprehend the impact upon the non-automotive arena. Confronted with the real fear and risk that International would, at some unknowable time, but likely in the near future, terminate its business with EWI, Kelke, White and Herdman sought to create a life raft whereby they would attempt to create a viable option of survivability for themselves. While this clearly was not the intended consequence of the master reorganization plan, it was an inevitable consequence of that plan.

Certainly, Defendants had no way of anticipating that McGovern was going to be leaving International. As the only person who knew that Kelke was contemplating starting his own company, McGovern felt compelled at the time and in the manner that she did to notify others. The unanticipated timing of the McGovern e-mail release (Murphy's Law) caused the abrupt termination of the individuals.

The emotional discharge displayed by EWI is misguided, overreaching and, in its attempts to destroy the Defendants, vindictive. All shows for which EWI had some pre-termination billable involvement will have been concluded by November 4, 2005. Any claims EWI have are solely damage claims for which there is an adequate remedy at law. The Motion for Preliminary Injunction should be denied forthwith.

WHEREFORE, Defendants pray for an Order denying the Motion for Preliminary Injunction and for such other relief as the Court deems appropriate.

Dated: November 1, 2005

Respectfully submitted,

INSPIRED EXHIBITS, INC., STEPHEN KELKE, ROBIN WHITE, LINDSAY MILLSAP, and ROBERT HERDMAN,

By: _____
One of Their Counsel

Alexander D. Kerr, Jr. (ARDC No. 1450484)
Tishler & Wald, Ltd.
200 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 876-3800 (phone)
(312) 876-3816 (fax)
e-mail: akerr@tishlerandwald.com

Thomas R. Merrick (ARDC No. 6283520)
Hynds Rooks Yohnka Mattingly & Bzdill
105 West Main Street
P. O. Box 685
Morris, IL 60450
(815) 942-0049 (phone)
(815) 942-0497 (fax)
e-mail: trm@hrymb.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that he served the foregoing **Defendants' Response to Plaintiff's Motion for Preliminary Injunction,** upon the following:

> Edward F. McCormack
> Jodi Rosen Wine
> JENKENS & GILCHRIST
> 225 West Washington, Suite 2600
> Chicago, IL 60606-3418
> (312) 425-3900

via e-mail and by depositing a true and correct copy in the U.S. mailbox located at 200 South Wacker Drive, Chicago, Illinois this 1st day of November, 2005, at or before the hour of 5:00 p.m.

Alexander D. Kerr, Jr. (ARDC No. 1450484)
Tishler & Wald, Ltd.
200 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 876-3800 (phone)
(312) 876-3816 (fax)
e-mail: akerr@tishlerandwald.com

## INDEX TO APPENDIX

1. Affidavit of Stephen Kelke

2. Affidavit of Robin White

3. Affidavit of Robert Herdman

4. Affidavit of Lindsay Millsap

5. Deposition of Jeffrey Byrne

6. Deposition of Amanda Donlavey

7. Deposition of Linda McGovern – *TO BE PROVIDED WHEN RECEIVED*

8. Deposition of Stephen Kelke (Vol. II) – *TO BE PROVIDED WHEN RECEIVED*

# Affidavit of

# Stephen Kelke

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EXHIBIT WORKS, INC., a<br>Michigan corporation,<br><br>            Plaintiff,<br><br>v.<br><br>INSPIRED EXHIBITS, INC., an<br>Illinois corporation, STEPHEN KELKE,<br>ROBIN WHITE, LINDSAY MILLSAP and<br>ROBERT HERDMAN,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)  Case No. 05 C 5090<br>)<br>)<br>)  Honorable James F. Holderman<br>)  U. S. District Court Judge<br>)<br>)<br>) |

### AFFIDAVIT OF STEPHEN M. KELKE

I, STEPHEN M. KELKE, being first duly sworn, deposes on oath and states as follows:

1. I was employed by Exhibit Works, Inc. from August 4, 1998 until Thursday, August 18, 2005.

2. During the time that I was employed by Exhibit Works, Inc., I held the positions of:

    a. Account Executive

    b. General Manager

3. During the time that I worked at Exhibit Works, Inc., my offices were located at:

    a. 13211 Merriman Road, Livonia, MI 48150

    b. 550 Warrenville Road, Suite 200, Lisle, IL 60532

4. While at Exhibit Works, Inc, I never had any written employment contract.

5. While at Exhibit Works, Inc., I never executed any non-compete agreement.

6. While at Exhibit Works, Inc., I never executed any non-solicitation agreement.

7. In or about June, 2001, I received an employee handbook. I acknowledged receipt of that handbook. I received no compensation or anything of value related to the receipt and acknowledgment of the employee handbook.

8. In or about July, 2002, I was relocated by Exhibit Works, Inc. from Detroit, Michigan to Lisle, Illinois.

9. In or about April, 2005, Exhibit Works, Inc. senior management effected an internal reorganization of the company, significantly shifting the focus of the company primarily to the automotive industry. The reorganization removed local control, and compromised local office responsiveness to client needs. The company mandated ISO compliance which, among other actions, was going to significantly add to overhead. While the Lisle Division would retain responsibility for its profit and loss, mandated corporate decisions would radically impact that P&L without any explanation as to remediation for impact upon compensation, commissions, bonuses, salaries, etc.

10. Customer dissatisfaction and customer concerns that elimination of the extensive use of subcontractors would increase costs caused an evaluation as to whether or not it would be prudent with my personal customer contacts to continue with Exhibit Works, Inc. if the imminent prospect was that the customer would have increased dissatisfaction and the customer did not fit the company's declared shifted emphasis to the automotive industry.

11. My client focus is trade shows. Exhibit Works, Inc.'s declared institutional focus is automotive. It is estimated that through July 31, 2005, approximately $125-130 million of the $151 million of fiscal year 2005 sales to that date was auto related, with the balance being all other activities, only one of which is a trade show component.

12. On Monday, August 15, 2005, I met with Dominic Silvio in Detroit, Michigan:

    a.  At that meeting, Dominic Silvio stated that he had been informed that I was leaving the company.

    b.  Dominic Silvio told me that he did not want me to leave and would try to change the structure, my role and responsibilities to get me to stay.

    c.  Dominic Silvio indicated that if I had to leave, he would be disappointed, but would understand.

    d.  Dominic Silvio pulled out the three-year financial performance of the Lisle Division, and stated that my performance had been proven, and that I was due approximately $63,000 in bonus.

    e.  I informed Dominic Silvio that I would think about the conversation and let him know of my decision.

13. I had planned to provide Exhibit Works, Inc. with the two-week's notice specified in the employee handbook on Friday, August 19, 2005.

14. When I arrived at the office on Thursday, August 18, 2005, I was met by Jeff Byrne, Vice-President of Sales, and Bill Ciccone, Director of the Human Resources Department. They escorted me into the conference room where my personal possessions had been boxed. They delivered some of my personal possessions to me and escorted me from the premises. I informed Messrs. Byrne and Ciccone that I had intended to provide the requisite two-week's notice the next day, but they rejected the offer and informed me that I was terminated immediately.

15. After termination, I had no property of Exhibit Works, Inc. except for some e-mails and a few miscellaneous papers which I have turned over to my attorney. I understand all those materials have been turned over to Exhibit Works, Inc.

16. While I was at Exhibit Works, Inc., with the exception of some financial reports and budgets, I possessed no documents which were identified as confidential or proprietary or an item of trade secrets. I am unaware of any information that I possess which would qualify as such type of information. All Exhibit Works, Inc. financial reports were in my office at termination and remain with Exhibit Works, Inc.

17. In recent months, I have successfully reacquired the Bentley Motors account for Exhibit Works, Inc. I have offered to assist Exhibit Works, Inc. in any way to assist in the transition of the Bentley Motors account. A copy of my letter communicating this offer is attached hereto as Exhibit A. Subsequent to my termination, I have been in communication with Bentley and encouraged them to remain with Exhibit Works. I would estimate annual revenue from this account to be $750,000 to $1,000,000.

18. Exhibit Works, Inc. routinely issues payroll in arrears. Friday, August 19, 2005 was to be a normal payday. My normal base paycheck is subject to a direct deposit instruction. I was informed by my bank that the Exhibit Works, Inc. payroll check was deposited and then caused to be reversed by Exhibit Works, Inc. Accordingly, I am uncompensated for services performed for the period August 8, 2005 through August 17, 2005 in the amount of $4,769.28. I have since received one check from Exhibit Works, Inc. via U.S. mail representing partial payment in the amount of $1,517.51.

19. Exhibit Works, Inc. has not reimbursed me for all expenses incurred for the sole benefit of Exhibit Works, Inc for the sum of $2,785.28. Exhibit Works, Inc. has not provided any paperwork for the rollover of ESOP interests which are vested.

20. I have been informed by a vendor that, since termination, Exhibit Works, Inc. has stated that if they shipped any product to a customer known as International Truck, they would be sued.

21. Dominic Silvio has informed customer(s) that what I did was what he had done 26 years ago when he founded Exhibit Works.

22. I have been informed by International Truck and Engine Corporation that they have terminated their relationship with Exhibit Works, Inc. Since my termination by Exhibit Works, that company has requested Inspired Exhibits, Inc. to perform future services for it.

23. I was informed that the termination was effective as of Wednesday, August 17, 2005. When I was terminated, I was told it was for cause and I would be unable to collect unemployment and any attempt to do so would be disputed. I turned over my office keycard prior to leaving.

24. I did not receive all of my personal items, including two (2) framed pieces of artwork.

25. I am over 21 years of age and of sound mind. I am competent to testify if called upon to do so, and would testify as set forth herein.

26. I have reviewed the answer to the complaint in the matter bearing the caption at the top of this affidavit and that answer is true and correct, either to the best of my personal knowledge or to the best of my information and belief after reasonable inquiry in the time available.

27. I have had the opportunity to review Exhibit Works' Complaint and Motion for Preliminary Injunction. There are factual inaccuracies, misapprehensions and misunderstandings set forth therein. Accordingly, I offer the following clarifications:

    A. Regarding International Truck Account Generally:

        i. I took over the International Truck account in April 2000. Dave Pitcher, Executive Vice-President of Sales, had been responsible for day-to-day management of the account, but was having difficulty servicing the account

and was not getting along professionally with the new International marketing contacts as they were about 30 years his minor. I reported to Dave Pitcher from April, 2000 to September, 2001 at which point Dave Pitcher transferred to California. I then reported to Kevin Pritchard in Livonia.

ii. When the decision was made by Exhibit Works to open an office in Chicago (opened September 2002), I then appointed Mick Hurley, who was an engineer for Exhibit Works in Livonia at the time, to take over the International account. Mick Hurley performed this duty from approximately January, 2003 to April, 2003 at which time he decided he did not want to move to Chicago (for family reasons) and relinquished his duties on the International account. In June, 2003, it was decided to elevate Robin White to run the International Truck account. She performed that role from July, 2003 until time of termination.

iii. At all times, International utilized multiple exhibit vendors of which Exhibit Works Inc. was one.

B. Regarding Warehouse Withdrawals:

i. On August 8, 2005, I was notified by Leon Bakka of Bentley Motors that Exhibit Works had been awarded the Bentley business. Leon wanted his properties removed from his now former exhibit house (George P. Johnson Co.) before the end of August, or he would have to pay for another month's warehouse rent to George P. Johnson.

ii. I was in Washington, D.C. at this time. Laurie Walton was on vacation this week. I contacted Robin White to see which International Truck properties needed to be refurbished prior to the fall show season. It was typical that

International would perform such refurbishment every fall. I called Exhibit Productions (which is the shop Exhibit Works uses to subcontract its fabrication work in Chicago) and asked them to arrange to have the properties picked up at the warehouse. As Laurie Walton normally scheduled trucks and I was out of town, it was simpler with the short notice to have the shop schedule the trucks and meet Robin at the warehouse to move the properties that would require refurbishment. Steve Graznyk, the warehouse manager, was late on August 9' and Robin White had to leave for a doctor's appointment at approximately 11:00 a.m. Once Steve arrived at the warehouse, I spoke with him on the phone and let him know what was going on and also told him of how much room was needed for the Bentley properties (approximately 5.5 truckloads). The International properties that needed repairs took up a total of 4 truckloads which were loaded on August 9 and 10 and delivered to Exhibit Productions on the same days they were loaded.

iii. When Laurie Walton returned from her vacation, I told her what had happened. Also, at the August 16 Executive Committee meeting, I informed the entire Executive Committee that the Exhibit Works Chicago warehouse was being readied for the Bentley properties which included moving properties to the shop for refurbishment work, and an e-mail was sent out to the entire Chicago office requesting them to dispose of any client properties that were no longer going to be used to make room for the Bentley freight. JoAnn Sewnig (Exhibit Works Chicago Account Executive) did get one of her customers, Foster Farms, to dispose of their properties in this effort.

      iv.  It was not at all uncommon for Exhibit Productions to pick up and deliver properties to/from the Exhibit Works Burr Ridge warehouse and the Exhibit Works Lisle office.  Exhibit Productions had also delivered client properties to local addresses on behalf of Exhibit Works.

C.  Regarding Great American Trucking Show:

      i.  Properties for the Great American Trucking Show were picked up on Sunday, August 21 from Exhibit Productions in Bedford Park, IL.  The following properties were used at the show:

        a)  7-foot Information Counter (was at Exhibit Productions as it needed the hinges on the doors fixed, crate needed repair and the counter needed some structural work done to it and had to be repainted).

        b)  4-foot Information Counter (this was at Exhibit Productions as it had just returned from the International Taking It To The Streets Tour. All properties from this tour were returned to the shop as many needed refurbishment as they got wet during the tour from various rain storms – the tour was outdoors).

        c)  Two (2) Diamond Road ID signs.  (These were at Exhibit Productions to be cleaned up and checked to make sure the lightboxes worked).

        d)  Two (2) People Story graphic modules (one was at Exhibit Productions and we had to fabricate the second unit and reproduce the graphics as Exhibit Works would not return the e-mail or telephone calls placed by International to Jeffrey Byrne and Dominic

8

Silvio to have Exhibit Works release properties that International Truck needed).

e) Aerodynamics display. (This was at Exhibit Productions as International wants to upgrade the display this year to include a smoke wand.)

f) Big Bore Engine. (This was at Exhibit Productions to touch-up paint the black base which had been scratched during transit.)

g) Literature racks, two (2) plasma stands, and plasmas. (These were at Exhibit Productions as they had also just returned from the Taking It To The Streets Tour.)

ii. After I was terminated on August 18, 2005 International Truck informed Exhibit Works that International was terminating its relationship. A copy of this e-mail was given to Exhibit Productions, and International Truck called Exhibit Productions and authorized them to ship the properties to the Great American Trucking show on International's behalf. At this time, Exhibit Productions set up the transportation for the properties.

D. Regarding the August 16, 2005 Michigan Meeting:

i. The thrust of the meeting was to review fiscal year end 2005 financial results. The Chicago division performed above expectations and was commended by the CFO, Michael Maraone, during the discussion.

ii. Other topics included marketing (which had a rough draft for how to present Exhibit Works in the future, no decisions were made, and it was more of a discussion of how are we viewed now and how do we want to be viewed). There was a presentation by Exhibit Works' auditing firm about corporate

fraud and how to detect it. Each division talked about business prospects. The focus of my talk was updating everyone on the Bentley win and how it was important for Exhibit Works in order to try to win the Volkswagen and Audi business as it is going out to bid in February 2006.

iii. As is the case with every meeting, we all had to hear about all of the problems Livonia (corporate) was having with Ford Motor Company. This discussion happens at every meeting and does not have any bearing on the Chicago business.

iv. I had to leave early so missed the presentations regarding corporate design, corporate manufacturing, the new fabrication facility in Atlanta, and the new retail division that Exhibit Works is exploring.

v. Overall I would say the meeting was backward looking as it dealt so heavily with the 2005 results of the company

E. Regarding Pre-Termination International Contact:

i. In late May, 2005, in a discussion with Linda McGovern at International, I provided a periodic update of Exhibit Works organizational changes and procedural adjustments. She asked if I was going to quit. I responded that I did not think that was a necessary response and had no such intention. She said that their advertising and public relations firms had recently gone through similar organizational and procedural changes which she found to be unacceptable. Further, she stated that one of the firms was being terminated. She stated that she preferred local firms that were more responsive to International's needs.

    ii. At no time, prior to termination, had International committed to or promised any business to me.


F. Lisle Office:

    i. The Lisle office was opened pursuant to a white paper prepared by the CFO and I to expand trade exhibit business.

    ii. The Lisle office was the first time Exhibit Works opened a site which was an office only without a production shop or a warehouse.

G. Prior Industry Experience:

    i. Prior to Exhibit Works, I worked for Armaly Brands as a Regional Sales Manager (housewares manufacturer) in Walled Lake, Michigan. One of my duties was to plan, merchandise and work tradeshow booths for Armaly. Shows I was involved in included International Housewares Show, International Hardware Show, SEMA-AAPEX, International Sanitary Supply Show and approximately 15 other regional shows. I worked at Armaly from January, 1995 to March, 1997. In addition, the owner of Armaly sat on the International Housewares Show Board and was president, so I knew the entire Housewares show staff.

    ii. From March, 1997 until hiring on at Exhibit Works in August, 1998, I worked as a sales representative for Detroit Housewares Sales Company. One of my responsibilities was to represent manufacturers of products including Weber-Stephens (grills), Remington, Tucker Housewares, Whitney Design at various shows including International Housewares, SEMA, Consumer Electronics Show, International Hardware Show, ACE Hardware and Cotter (True Value)

11

Spring and Fall Shows, Meijer Show for Store Managers and other smaller shows.

28. 2005 shows involving International Truck for which any work of substance was done pre-termination have been or will have been all concluded prior to November 14, 2005.

29. To the extent that there would be any information regarding an International Truck show known only to Exhibit Works, Inc. prior to termination, the business usefulness of that information, if any, would expire upon the commencement of the show.

**FURTHER DEPONENT SAYETH NOT.**

"OFFICIAL SEAL"
ROSALIANNA M. RIVERA
Notary Public, State of Illinois
My Commission Expires 06/12/2009

Stephen M. Kelke

SUBSCRIBED to and SWORN before me
this _28th_ day of _OCT_ , 2005.

Notary Public

# Affidavit of

# Robin White

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EXHIBIT WORKS, INC., a<br>Michigan corporation,　　　　)<br>　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　)<br>　　　　　　Plaintiff,　　　　)<br>v.　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　)<br>INSPIRED EXHIBITS, INC., an　)<br>Illinois corporation, STEPHEN KELKE,　)<br>ROBIN WHITE, LINDSAY MILLSAP and　)<br>ROBERT HERDMAN,　　　　　)<br>　　　　　　　　　　　　　　)<br>　　　　　　Defendants.　　)| Case No. 05 C 5090<br><br>Honorable James F. Holderman<br>U.S. District Court Judge |

## <u>AFFIDAVIT OF ROBIN A. WHITE</u>

I, ROBIN A. WHITE, being first duly sworn, deposes on oath and states as follows:

1. I was employed by Exhibit Works, Inc. from February, 1997 until Thursday, August 18, 2005.

2. During the time that I was employed by Exhibit Works, Inc., I held the positions of:

    a.  Account Coordinator

    b.  Account Executive

3. During the time that I worked at Exhibit Works, Inc., my offices were located at:

    a.  13211 Merriman Road, Livonia, MI 48150

    b.  550 Warrenville Road, Suite 200, Lisle, IL 60532

4. While at Exhibit Works, Inc, I never had any written employment contract.

5. While at Exhibit Works, Inc., I never executed any non-compete agreement.

6. While at Exhibit Works, Inc., I never executed any non-solicitation agreement.

7. In or about June, 2001, I received an employee handbook. I acknowledged receipt of that handbook. I received no compensation or anything of value related to the receipt and acknowledgment of the employee handbook.

8. In November, 2002, I was relocated by Exhibit Works, Inc. from Detroit, Michigan to Lisle, Illinois.

9. In or about early 2005, Exhibit Works, Inc. senior management effected an internal reorganization of the company, which significantly shifted the focus of the company primarily to the automotive industry. The reorganization removed local control and compromised local office responsiveness to client needs. The company mandated ISO compliance which, among other actions, was going to significantly add to overhead. While the Lisle Division would retain responsibility for its profit and loss, mandated corporate decisions would radically impact that P&L without any explanation as to remediation for impact upon compensation, commissions, bonuses, salaries, etc.

10. My client focus is trade shows. Exhibit Works, Inc.'s declared institutional focus is automotive shows and events.

11. I had planned to provide Exhibit Works, Inc. with the two-week's notice on Friday, August 19, 2005 specified in the employee handbook.

12. When I arrived at the office on Thursday, August 18, 2005, I was met by Jeff Byrne, Vice-President of Sales, and Bill Ciccone, Director of the Human Resources Department. They escorted me into the conference room where my personal possessions had been boxed. They delivered some of my personal possessions to me and escorted me from the premises.

13. I have no property of Exhibit Works, Inc. except for old show folders, an inventory of International display properties, and e-mails on diskette all of which have been provided to my attorney.

14. I have retained copies of e-mails sent by International Truck to me and a copy of the International Truck display properties inventory, all of which would have been available from, *inter alia*, International Truck.

15. 2005 shows involving International Truck for which any work of substance was done pre-termination have been or will have been all concluded prior to November 14, 2005.

16. To the extent that there would be any information regarding an International Truck show known only to Exhibit Works, Inc. prior to termination, the business usefulness of that information, if any, would expire upon the commencement of the show.

17. While I was at Exhibit Works, Inc., with the possible exception of some financial reports, I possessed no documents which were identified as confidential or proprietary or an item of trade secrets. I am unaware of any information that I possess which would qualify as such type of information.

18. Exhibit Works, Inc. routinely issues payroll in arrears. Friday, August 19, 2005 was to be a normal payday. My normal base paycheck is subject to a direct deposit instruction. I was informed by my bank that the Exhibit Works, Inc. payroll check was deposited and then caused to be reversed by Exhibit Works, Inc. Accordingly, I am uncompensated for services performed for the period August 8, 2005 through August 17, 2005.

19. Exhibit Works, Inc. has not reimbursed me for all expenses incurred for the sole benefit of Exhibit Works, Inc. in the sum of $2,534.74. Exhibit Works, Inc. has not provided any paperwork for the rollover of ESOP interests which are vested.

3

20. Part of my compensation was based upon commissions. It was the general practice to pay commissions as the customer paid their accounts. As of termination, my current unpaid commission balance is $19,076.07 plus $55,360.67 accrued and unpaid.

21. I have been informed by International Truck and Engine Corporation that they have terminated their relationship with Exhibit Works, Inc. That company has requested Inspired Exhibits, Inc. to perform future services for it.

22. I was informed that the termination would be effective as of Wednesday, August 17, 2005. When I was terminated, I was told it was for cause and I would be unable to collect unemployment and any attempt to do so would be disputed. I turned over the corporate American Express card and office keycard prior to leaving.

23. Prior Industry Experience:

    a. November, 1990 – January, 1993, I worked in the Marketing Department at Eagle Pitcher Automotive Group in Inkster, Michigan where I coordinated their tradeshow program.

    b. July, 1993 – February, 1997, I worked for Exhibit Productions, Inc. in Dearborn, Michigan as an Account Manager. In February, 1997, David Pitcher, Executive Vice-President of Sales at Exhibit Works called me at home on a Sunday to ask if I would be interested in discussing employment at Exhibit Works. We scheduled a dinner later in the week. Following the dinner, David Pitcher offered me a job at Exhibit Works as an Account Coordinator. My duties at Exhibit Productions were the same as my duties at Exhibit Works until I was promoted to Account Executive in July, 2003.

24. I am over 21 years of age and of sound mind. I am competent to testify if called upon to do so, and would testify as set forth herein.

25. I have reviewed the answer to the complaint in the matter bearing the caption at the top of

this affidavit and that answer is true and correct, either to the best of my personal

knowledge or to the best of my information and belief after reasonable inquiry in the time

available.

**FURTHER DEPONENT SAYETH NOT.**

"OFFICIAL SEAL"
ROSALIANNA M. RIVERA
Notary Public, State of Illinois
My Commission Expires 06/12/2009

SUBSCRIBED to and SWORN before me
this _____ day of _____, 2005.

_____
Notary Public

5